UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
UNITED STATES OF AMERICA,

-against-

OPINION AND ORDER
CR 13-0338 (SJF)

CARL FIORENTINO,

Defendant.
----------------------------------------------------------------X
FEUERSTEIN, District Judge.

Before the Court is defendant Carl Fiorentino's motion to transfer venue from the Eastern District of New York to the Southern District of Florida. For the following reasons, defendant's motion is **GRANTED**.

I. **Background**

Systemax, Inc. ("Systemax") was a Delaware corporation with its principal place of business in Port Washington, New York.[1] Since 1995, Systemax has been a public company registered with the United States Securities and Exchange Commission. Systemax was a wholesaler of brand name and private label electronic and computer products. TigerDirect, a subsidiary of Systemax with its principal place of business in Miami, Florida, was a retailer of computer hardware and software. TigerDirect sold its products online and through retail stores and by direct mail.

Defendant Carl Fiorentino ("defendant") was employed by Systemax from 1995 through May 2011 as president of TigerDirect. Defendant's responsibilities included selecting suppliers for TigerDirect's products and approving the quantities and prices of merchandise purchased by

---

1. The allegations are taken from the superseding indictment (DE 14).

the company. John Doe #1 was the owner of a company which operated from Taiwan ("John Doe Company") and sold computer components, peripherals and accessories ("computer components") to TigerDirect. Between approximately 2003 and December 2010, TigerDirect paid the John Doe Company approximately $157,000 for computer components.

John Doe #2 was the president of a California corporation ("Corporation A") established in approximately 1985 and located in Fremont, California. Corporation A manufactured computer parts which were sold directly to TigerDirect.

Xstream Productions, LLC was a Delaware corporation established in approximately October 2002 by defendant Carl Fiorentino, who was the sole shareholder.

John Doe #3 provided tennis lessons and coaching services to defendant's sons. In addition, John Doe #3 established Direct2UMall, Inc., a Delaware corporation, in approximately 2002 which is located in Miami, Florida. Direct2UMall maintained a corporate bank account at Terrabank, N.A. in Miami, Florida. John Doe #3 was designated as President and Secretary on Direct2UMall's corporate records and was a signatory on the Terrabank account, as was defendant. John Doe #3 also maintained a personal bank account at Executive Bank, N.A. in Miami, Florida.

Corporation B was a New York corporation with its principal place of business in Merrick, New York which sold video surveillance equipment. Corporation B maintained a corporate bank account at Citibank, N.A. in Uniondale, New York.

According to the superseding indictment, between approximately January 2003 and April 18, 2011, defendant, John Doe #1, John Doe #2 and others engaged in a scheme whereby defendant caused TigerDirect to buy, among other things, computer components from the John

Doe Company and Corporation A in exchange for secret payments to defendant and to others for the benefit of defendant. In addition, defendant and John Doe #1 agreed to cause TigerDirect to pay higher prices for computer components from the John Doe Company than it would have paid had it purchased the parts from other suppliers. Between approximately January 2003 and January 2011, TigerDirect paid the John Doe Company approximately $157,000 for computer components. During that same time period, John Doe #1 sent and caused to be sent to defendant, and to others for the benefit of defendant, secret payments via wire transfers in the sum of $6,500,000.

Similarly, between approximately January 2003 and November 2007, TigerDirect paid Corporation A approximately $80,000,000 for its products. During that time period, John Doe #2 sent and caused to be sent to defendant, and to others for defendant's benefit, secret payments in the form of checks totaling approximately $570,000.

In furtherance of the alleged fraudulent scheme and for the purpose of disguising the nature, source, ownership and control of the secret payments to defendant, John Doe #1 and John Doe #2 sent and caused to be sent payments in the form of wire transfers and checks payable to various individuals, entities and accounts. Defendant did not disclose these secret payments to TigerDirect or Systemax. He used the proceeds for a variety of personal expenses, including the purchase of his $8 million personal residence, furnishings, personal credit card expenditures and for John Doe #3's tennis coaching services.

In a further effort to conceal the fraudulent scheme, defendant sent and caused to be sent to Systemax, via United States mail, materially false and fraudulent conflict of interest

questionnaires[2] ("COIQs") which failed to disclose the related party transactions between defendant and John Doe #1 and John Doe #2. In each of the COIQs defendant sent to Systemax for the 2008, 2009 and 2010 calendar years, he falsely represented that he: (1) did not have a significant financial interest in any current supplier of Systemax and TigerDirect; (2) did not receive or make any arrangements for the receipt of any compensation or other financial benefit from a current supplier; (3) did not receive cash or cash equivalents of any value from any supplier; and (4) did not have any financial or other beneficial interest in any transaction between Systemax and any third party.

The indictment alleges that as a result of this fraudulent scheme, defendant defrauded Systemax and TigerDirect by depriving them of the opportunity to make informed decisions with regard to their purchases of computer components and by causing the companies to pay higher prices for the merchandise purchased from the John Doe Company. Furthermore, the falsified COIQs prevented the SEC, Systemax and Systemax's shareholders from learning the full extent of defendant's compensation as well as the nature and scope of related party transactions and other similar transactions between defendant, the John Doe Company and Corporation A.

The indictment charges defendant with one (1) count of conspiracy to commit mail and wire fraud; two (2) counts of mail fraud; two (2) counts of wire fraud; and one (1) count of engaging in a money laundering conspiracy.

Defendant now moves for a transfer of venue from the Eastern District of New York

---

2. The Securities and Exchange Commission ("SEC") requires public companies to disclose (1) management compensation; and (2) transactions in which a "related person," including any director or officer of the company or any immediate family member of a director or officer, had any interest. To comply with SEC rules and regulations, Systemax's and its subsidiaries' directors, officers and other representatives are required to complete and sign a Conflict of Interest Questionnaire for submission to Systemax's Vice President for Internal Audit.

("EDNY") to the Southern District of Florida ("SDFL").

## II. Discussion

### A. Standard to Transfer Venue

Federal Rule of Criminal Procedure 21(b) provides that "[u]pon the defendant's motion, the court may transfer the proceeding, or one or more counts, against that defendant to another district for the convenience of the parties, any victim, and the witnesses, and in the interest of justice." "Disposition of a Rule 21(b) motion is vested in the sound discretion of the district court." *United States v. Maldonado-Rivera*, 922 F.2d 934, 966 (2d Cir. 1990). District courts balance ten factors to determine whether or not venue should be transferred:

> (1) location of defendant; (2) location of potential witnesses; (3) location of events likely to be at issue; (4) location of relevant documents; (5) potential for disruption of defendant's business if transfer is denied; (6) expenses to be incurred by the parties; (7) location of counsel; (8) relative accessibility of the place of trial; (9) docket conditions in each district; and (10) any other special circumstances that might bear on transfer.

*Platt v. Minnesota Mining and Mfg. Co.*, 376 U.S. 240, 243-44 (1964). "No one of these considerations is dispositive, and '[i]t remains for the court to try to strike a balance and determine which factors are of greatest importance.'" *Maldonado-Rivera*, 922 F.3d at 966 (quoting *United States v. Stephenson*, 895 F.2d 867, 875 (2d Cir. 1990)).

A defendant bears the burden of showing that a transfer of venue is in the interests of justice. *United States v. Estrada*, 880 F. Supp. 2d 478, 482 (S.D.N.Y. 2012). Furthermore, "[a]s a general rule, a criminal prosecution should be retained in the original district" in which the indictment was returned. *United States v. U.S. Steel Corp.*, 233 F. Supp. 154, 157 (S.D.N.Y. 1964). "Of course, the general preference notwithstanding, 'there are circumstances where

transfer is appropriate.' " *Estrada*, 880 F. Supp. at 481 (quoting *United States v. Posner*, 549 F. Supp. 475, 477 (S.D.N.Y. 1982)). "To warrant a transfer from the district where an indictment was properly returned it should appear that a trial there would be so unduly burdensome that fairness requires the transfer to another district of proper venue where a trial would be less burdensome . . . ." *Id*

## B.     Defendant's Motion to Transfer Venue

### 1.     Location of Defendant

In support of is motion to transfer venue to the SDFL, defendant argues that he is a lifelong resident of Miami, Florida and has resided there since he was one (1) year old. Defendant also claims that he needs to be in Florida to care for his elderly and infirm mother, who resides in Miami. In response to the government's complaint that his moving papers contained no objective proof of his mother's condition, defendant's reply papers included a document dated June 7, 2013 from his mother's doctor. According to the document, defendant's mother became acutely ill at the end of May 2013. Mem. in Reply, Exh. A.

Defendant also claims that he has always worked in southern Florida, including the time he was president of Florida based TigerDirect. Mem. in Supp. p. 9.

The government argues that defendant has failed to show that transfer is warranted. It contends that defendant merely recites a list of inconveniences, but fails to demonstrate that trial in the EDNY would be unduly burdensome. Although the government concedes that litigation in the requested district would be less expensive for defendant and defense counsel, it urges the Court to give little weight to this factor in the overall transfer analysis. Mem. in Opp. pp. 9-11.

"While a defendant's residence 'has no independent significance,'" *Platt*, 376 U.S. at 245, 'as a matter of 'policy,' courts should, 'wherever possible,' try defendants where they reside.'" *United States v. Brooks*, No. 08 Cr. 35, 2008 WL 2944626, at *2 (S.D.N.Y. July 31, 2008) (quoting *United States v. Spy Factory, Inc.*, 951 F. Supp. 450, 464 (S.D.N.Y. 1997). *See Posner*, 549 F. Supp. at 477 ("Both defendants reside in Miami–a factor favoring transfer to the Southern District of Florida."). In light of this policy, this factor weighs in favor of transferring venue to the SDFL.

Additionally, defendant represents that he assists in the care of his infirm mother who recently suffered a series of strokes. Mem. in Supp. p. 8. "While these facts alone are not sufficient to warrant transfer, defendant's residence and family concerns," *United States v. Hanley*, No. 94 Cr. 394, 1995 WL 60019, at *2 (S.D.N.Y. Feb. 10, 1995), also favor transfer.

### 2. Location of Potential Witnesses

According to defendant, "[a] substantial majority of the potential witnesses for both the government and the defense live in South Florida." Mem. in Supp. p. 9. Defendant generally identifies these potential witnesses as individuals residing in southern Florida who either worked with defendant during the relevant time period or who can establish that the payments were for his benefit, at least some of whom the government will need to call to prove its case. *Id.* Furthermore, according to defendant, the law enforcement personnel who executed the search warrant on his home are potential government witnesses who also reside in southern Florida. *Id.* at 10. The affiant in support of the search warrant for defendant's home, Internal Revenue Service Agent Aileen Martinez, likewise resides in southern Florida. In addition, defendant claims that his defense relies on testimony from many former and current TigerDirect employees,

most of whom live in southern Florida. *Id.*

In response to the government's argument that defendant utterly failed to meet his burden on this motion because he offered neither specific examples of the proposed witnesses' testimony nor any reasons for their alleged inability to testify at a trial held in the EDNY, defendant attached a list of potential witnesses as well as their names, redacted addresses and a "description" of the named individual's testimony. Mem. in Reply, Exh. B.

However, "[c]ourts in other circuits have held that '[g]enerally, a naked allegation that witnesses will be inconvenienced by trial in a distant forum will not suffice for transfer. . . . Defendants must offer specific examples of witnesses' testimony and their inability to testify because of the location of the trial. . . . [T]he court must rely on 'concrete demonstrations' of the proposed testimony.' " *Spy Factory, Inc.*, 951 F. Supp. at 456 (quoting *United States v. Haley*, 504 F. Supp. 1124, 1126 (E.D. Pa. 1981)). *See United States v. Guastella*, 90 F. Supp. 2d 335, 338-39 (S.D.N.Y. 2000) (holding that this factor did not weigh in defendants' favor when they failed to provide the court with their witnesses' identities and specific examples of their proposed testimony). The witness list provided by defendant is devoid of the "concrete demonstrations" of proposed testimony necessary to find that this factor favors defendant. Accordingly, based on defendant's conclusory allegations concerning his witnesses' testimony, this factor weighs against transfer to the SDFL.

### 3. Location of the Events

The superseding indictment (DE 14) in this case essentially charges defendant with conspiring with others, individuals primarily located in Taiwan and California, to steer TigerDirect to purchase goods from certain suppliers in those jurisdictions in exchange for secret

payments or "kickbacks" to defendant. The superseding indictment also charges that defendant submitted false and fraudulent certifications to Systemax to conceal the scheme and that defendant made financial transactions and transfers in the United States and elsewhere in a manner that concealed both the source of the illegal payments and defendant's control and ownership over said funds.

Defendant claims he handled issues arising at TigerDirect in Miami and that he had no management or corporate responsibilities in New York at Systemax headquarters. Mem. in Supp. p. 12. Thus, according to defendant, the primary locus of the alleged fraud conspiracy, i.e., the "nerve center," was Florida, not New York. Given that all acts and conduct in furtherance of the alleged scheme purportedly occurred in Florida, transfer to the SDFL is appropriate. *Id.*

Although the government concedes that much of defendant's criminal activity took place in the SDFL, it argues that transfer is nevertheless improper because defendant's coconspirators were located in and orchestrated acts in other jurisdictions, including Taiwan and California. Mem. in Opp. pp. 14-15. It further argues that actions crucial to the scheme, i.e., false submissions to Systemax and wire transfers consisting of illegal payments, reached into the EDNY in a significant way. *Id.* at 15. The defendant's mailings to New York were crucial, according to the government, because the false submissions were the only way defendant could conceal the illegal payments from Systemax. Furthermore, the defendant's actions ensuring the transfer of kickback money directly from his coconspirators to other individuals and then to others for defendant's benefit was likewise crucial to the scheme. *Id.*

This factor weighs in favor of defendant. Had defendant not engaged in the alleged scheme from the TigerDirect offices in Florida, there would be no case. New York is only

involved by virtue of Systemax's choice to locate its office in that state. *See United States v. Templin*, 251 F. Supp. 2d 1223, 1225 (S.D.N.Y. 2003) (holding that "the state where defendant resides and works, and where all of the charged illegal activities took place" is the state where defendant should be tried); *Ohran*, 2000 WL 620217, at *3 (holding that "defendant's residence in Florida, the fact that all his allegedly criminal acts took place there, and the location of his business there . . . strongly support the requested transfer").

### 4. Location of Relevant Documents

"The location of documents and records is not a major concern in these days of easy and rapid transportation." *Posner*, 549 F. Supp. at 478. *See Brooks*, 2008 WL 2944626, at *2 (same). Accordingly, this factor is neutral to the transfer analysis.

### 5. Disruption of Defendant's Business if Transfer is Denied

According to defendant, he has been unemployed for the previous two (2) years and essentially lives on his diminishing savings. Mem. in Supp. p. 14. This factor does not, therefore, weigh in favor of transfer.

### 6. Expenses to Be Incurred by the Parties

Defendant argues that trial in the EDNY would result in significant and substantial personal expense because he resides in Florida where the majority of witnesses and documents are located and where his attorneys and investigative team also reside. *Id.* at p. 15. Trial in New York, as opposed to remaining in Florida and attending court locally, will result in significant out-of-pocket expenses for accommodations, meals, transportation, etcetera. *Id.* In addition, defendant will be responsible for the defense witnesses' costs. Defendant estimates that his costs

and living expenses for a six-week trial in the EDNY will be at least $44,600. *Id.* at p. 16.

On the other hand, the government's expenses to try this case in the SDFL would likely include relocating the trial team consisting of two (2) United States Assistant Attorneys and the case agents to Florida for the duration of the trial. The government would also bear the expense of bringing its witnesses to the SDFL.

"Every litigation, particularly a criminal prosecution, imposes burdens upon a defendant and brings in its wake dislocation from normal occupational and personal activities." *U.S. Steel Corp.*, 233 F. Supp. at 157. These incidental burdens, however, "which normally follow when one is called upon to resist a serious charge do not ipso facto make the necessary showing that a transfer is required in the interest of justice." *Id.*

That both parties will be subject to additional and potentially extraordinary expenses if this case is transferred to the SDFL or kept in the EDNY is beyond dispute. There is no evidence on this record that defendant is in a better position to absorb the costs. Allegedly, he is unemployed and living off his savings. Consequently, this factor does not weigh either for or against transfer.

7.  **Location of Counsel**

Defendant's attorney, Silvia Pinera-Vasquez ("Pinera-Vasquez"), claims that she is uniquely qualified to represent defendant because she has represented him for over two (2) years during the pendency of this case and is familiar with its flaws. Pinera-Vasquez lives and works in southern Florida, where she is a sole practitioner with a single office. Mem. in Supp. p. 17. She argues that a prolonged absence from her office would result in a severe strain on her other

cases and investigations. Likewise, defendant's investigators also work and reside in southern Florida. *Id.* at p. 18.

The government points out that Pinera-Vasquez is currently appearing in this district on another criminal matter before the undersigned.[3] In that case, Pinera-Vasquez joined in a motion to transfer venue from the SDFL to the EDNY. Thus, the government argues, Pinera-Vasquez's claim that representing defendant in the EDNY would be inconvenient is a cover for what actually amounts to forum shopping. Mem. in Opp. pp. 18-19.

The Court is not so convinced. Every case, and a criminal case in particular, requires its own litigation strategy as dictated by its circumstances and demands. As defendant points out, the other case involved nine (9) co-defendants who had local counsel, which made the transfer feasible and, thus, the circumstances of that case are distinguishable from the instant case. Mem. in Reply p. 8. Given Pinera-Vasquez's familiarity with the case and the fact that she and the investigators reside in Florida where the bulk of the alleged misconduct took place, this factor weighs in favor of transfer to the SDFL.

### 8. Relative Accessibility of the Place of Trial

"The efficiency of modern air transportation renders rather sterile any argument based upon differences in distances from the respective courthouses." *U.S. Steel Corp.*, F. Supp. at 158. Because both Miami and Long Island are served by air and other forms of transportation making either courthouse easily accessible, this factor is neutral to the transfer analysis.

---

3. The case is captioned *United States v. Weaver et al.*, 13-CR-120 (SJF)(AKT).

### 9. Docket Considerations

According to defendant and based on the available statistics from the Administrative Office of the United States Courts, the SDFL docket is less congested than the EDNY's docket. Defendant cites to a September 2012 report which shows that the EDNY had 2094 pending criminal cases while the SDFL had 1295 pending criminal cases. Defendant also notes that while the EDNY has twenty-seven (27) Article III judges versus twenty-three (23) in the SDFL, the EDNY has a 39% greater criminal caseload than the SDFL.

The government contends that defendant's statistics are largely irrelevant, but if they are to be considered, the Court should take into account that the number of judgeships does not include the number of senior judges in either district. Nor do the statistics take into account the fact that the SDFL operates in five (5) different courthouses while the EDNY operates in only two (2). Furthermore, the government argues, defendant's statistics do not account for variables such as the type and complexity of cases brought in each district, the number of defendants and custody status, all of which effect resolution of a case.

Both districts have the means and capability to try this single defendant case. Consequently, this factor does not sway the transfer analysis either way.

### 10. Special Circumstances

#### a. Character Witnesses

Notwithstanding defendant's failure to include concrete examples of potential witness testimony in his motion to transfer venue, "of substantial relevance is the location of records, witnesses and such key personnel of defendant[] as may be called upon to assist in the defense."

*U.S. Steel Corp.*, 233 F. Supp. at 157. Given the government's fraud allegations, defendant's intent and his general character are germane to this case. In fact, "courts have recognized, the impact of character witnesses is generally greater in the district where such witnesses live and work." *United States v. Martino*, No. 00 Cr. 389, 2000 WL 1843233, at *6 (S.D.N.Y. Dec. 14, 2000). *See Ohran*, 2000 WL 620217, at *3 ("[D]efendant has identified a number of Florida residents who will testify as character witnesses for him and argues persuasively that the impact of their testimony on a jury would be greater in Florida where they live and work than it would be on a jury in New York."); *United States v. Aronoff*, 463 F. Supp. 454, 458 (S.D.N.Y. 1978) (holding "location of character witnesses is significant"). Defendant should be within reasonable proximity to those who can assist in his defense and consequently, this circumstance weighs in favor of transfer.

### b. The Ongoing Investigation in Florida

According to defendant's undisputed representations, he is currently the target of an ongoing criminal investigation in the United States Attorney's Office ("USAO") for the Southern District of Florida. The investigation is currently assigned to an Assistant United States Attorney, who works for the Economic Crimes Division, and to Internal Revenue Service Special Agent Aileen Martinez. Martinez is also involved with the instant case and was the affiant in support of the search warrant for defendant's Florida home.

Upon discovering this second investigation, defendant's legal team learned that a civil case filed in Miami in January 2012 by Robert Leeds, the founder and current chief executive officer of Systemax, and his two brothers, also officers of Systemax, requested that the USAO in

Miami investigate the allegations made by Systemax and TigerDirect against defendant. Dissatisfied with the Miami USAO's response, the Leeds brothers asked the USAO in the EDNY to participate in the investigation, which led to the indictment in the instant case. The Court finds these circumstances, the seemingly related ongoing investigation into defendant's business practices in Florida as well as the location of defendant's character witnesses, weigh in favor of transferring venue to the SDFL.

### III. Conclusion

Upon weighing all of the foregoing factors and in the interests of justice, defendant's motion to transfer venue from the Eastern District of New York to the Southern District of Florida is hereby **GRANTED**. The Clerk of the Court is instructed to transfer this case to the Southern District of Florida and to mark it off of this Court's docket.

**SO ORDERED.**

Dated: January 6, 2014
      Central Islip, New York

s/ Sandra J. Feuerstein
_____
Sandra J. Feuerstein, U.S.D.J.